UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

TERRANCE DAUGHTRY, JR.,
FORD BECKWITH,
EDWIN J. FERNANDEZ, and
SAMUEL D'AGOSTINO, JR.

     *Plaintiffs,*

**COMPLAINT
AND JURY DEMAND**

_____CV_____

     V.

STEVEN G. JAMES, individually and as
Superintendent of the New York State Police,
JOHN GARCIA, individually and as Sheriff of Erie County,
MICHAEL J. KEANE,  individually and as Erie County District Attorney,
M. WILLIAM BOLLER, individually and as
Erie County pistol permit licensing officer,
THOMAS J. DOUGHERTY, individually and as Sheriff of Livingston County.
ASHLEY WILLIAMS, individually and as Livingston County District Attorney,
KEVIN VAN ALLEN, individually and as
Livingston County pistol permit licensing officer,
MICHAEL R. NOLAN, individually and as
Oneida County pistol permit licensing officer,
ROBERT MACIOL, individually and as Sheriff of Oneida County,
TODD CARVILLE, individually and as Oneida County District Attorney,

     *Defendants.*

---

1

"The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them."

--Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833)

"The possession of arms is the distinction between a freeman and a slave."

James Burgh (1774)

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the plaintiffs hereby demand a jury trial of all issues so triable.

## INTRODUCTION

1. This is an action to vindicate the right of the plaintiffs to keep and bear arms under the Second Amendment to the United States Constitution, which prohibits infringement of the right of citizens to keep and bear firearms for the defense of self and family and for other lawful purposes.

## PARTIES

2. The plaintiff TERRANCE DAUGHTRY is a resident of the Village of Williamsville and County of Erie.

2

3. The plaintiff FORD BECKWITH is a resident of the Village of Blasdell and County of Erie.

4. The plaintiff EDWIN FERNANDEZ is a resident of the City of Utica and Oneida County.

5. The plaintiff SAMUEL D'AGOSTINO, JR is a resident of the Town of Caledonia and Livingston County.

6. All plaintiffs are natural persons, over 21, citizens of the United States and law-abiding, responsible gun owners who are not prohibited under federal law from possessing firearms or ammunition.

7. Defendant STEVEN G. JAMES is Superintendent of the New York State Police whose principal place of business is in Albany (Albany County), New York.

8. As Superintendent of the New York State Police, defendant is required to enforce the criminal and administrative provisions of the Penal Law throughout the State. "It shall be the duty of the superintendent of the state police and of members of the state police to prevent and detect crime and apprehend criminals." Executive Law § 223.

9. The State Police is a quasi-military organization in which all officers must follow the orders of the Superintendent on pain of being immediately terminated.

10.   The Superintendent, with the approval of the Governor, his superior officer, is committed to violating the plaintiffs' right to bear arms whenever he or his subordinates can do so and by whatever means are available.

11.   A review of recent reports from the State Police's own website, indicates that, with the approval and under the direction of the Superintendent, the State Police are engaged in the regular investigation, arrest and prosecution of anyone they believe to be in violation of the State' s unconstitutional pistol permit law and related criminal statutes. See, N.Y. PEN. LAW §§ 265.20(3), 265.01-265. 04, 265.20(a)(3), 400.00.

12.   On information and belief, the State Police regularly refer matters to the relevant pistol permit licensing officer when they believe that any permit holder has violated a criminal statute.

13.   If any one of the unlicensed plaintiffs were found by the State Police to be in possession of a handgun or semiautomatic rifle, they would be immediately arrested by the State Police and thus the State Police are a direct, palpable and immediate threat to violate their right to bear arms whenever the plaintiffs choose to exercise that right.

14. Defendant Steven G. James, as Superintendent of the New York State Police, is responsible under Penal Law § 400.00 for approving the form of pistol permit applications and licenses used throughout the state (outside New York City).

The application form was issued and is enforced pursuant to that statutory authority and under his supervision.

15. The defendant M. WILLIAM BOLLER is a New York State Judicial Hearing Officer and is the licensing officer for pistol permits in Erie County.

16. Defendant MICHAEL R. NOLAN, is the Oneida County pistol permit licensing officer and a County Judge.

17. Defendant KEVIN VAN ALLEN is the Livingston County pistol permit licensing officer and a County Judge.

18. Pistol permit officers in Upstate New York, only 43 percent of the state by population, happen to be judges but they do not act in a judicial capacity. Instead, they act in an executive, administrative and regulatory capacity and exercise the police power of the state. They "work together with law enforcement to investigate the applicant's fitness to possess firearms. . ." *Kellogg v. Nichols*, en banc dissent at 18 (June 30, 2026). A pistol permit judge acts as a "government regulator." *Id.*

19. Licensing officers oversee the investigation of applicants by the relevant police agency. Penal Law 400.00(1) and (4). Investigation is not a judicial function. Licensing officers are required to "interview" the applicant and this interview is not required to be under oath or recorded in any way. *Id.*

20. The results of the police investigation are not required to be disclosed to the applicant, and on information and belief, generally are not unless a lawyer requests them.  See Penal Law 400.00(4).

21. The state of New York treats pistol permit judges as administrators by allowing them to be sued in Article 78 proceedings.

22. The State of New York itself admitted this in Joint Opinion 18-57/17-166 which rescinded Opinion 17-166 (applying judicial ethics rules to permit judges) as impractical: the functions of a permit judge "are in some ways inconsistent with the traditional neutral role of a judge, particularly to the extent they may authorize or mandate the judge to investigate sua sponte the propriety of a previously granted firearm license and/or to initiate and conduct a firearm license revocation or suspension proceeding without participation of the functional equivalent of a separate quasi-prosecutorial or law enforcement agency." New York Advisory Committee on Judicial Ethics.

23. Pistol permit judges supervise large clerical and investigative staffs in sheriffs' and permit offices, a non-judicial function.

24. Granting these judges absolute immunity would deprive the plaintiffs of the opportunity to obtain complete relief for the violations of their Second Amendment rights.

25. On information and belief, in almost all states with permitting schemes and in over half of the state of New York, licensing officers are not judges.

26. *Kellogg v. Nichols,* 170 F4th 20 (2nd Cir. 2025), amended, March 5, 2026, in a "narrow" decision limited to the "record before us," held that a permit judge may not be sued for lack of a case and controversy.  The Second Circuit, en banc, upheld this decision 7-6 in a 98-page opinion on June 30, 2026. This complaint makes additional allegations.  In any event, to preserve this issue pending a final resolution of this issue by the Supreme Court, we have named three permit judges.  We intend to challenge the holding of *Kellogg,* if applicable, through en banc rehearing and writ of certiorari relief on the basis of the ancient Latin maxim, "Ubi jus, ibi remedium" ("Where there is a right, there is a remedy").  See, Judge Sullivan's en banc dissent at page 10.

27. Defendant Michael J. Keane is the Erie County District Attorney and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Erie County, including all crimes under N.Y. Penal Law § 265.00 et seq. See County Law § 700(1). Defendant Keane has stated he favors aggressive enforcement of laws banning unlawful possession of loaded weapons (which incudes possession without a license).[1]

28. Defendant Todd Carville is the Oneida County District Attorney and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Oneida County, including all crimes under N.Y. Penal Law § 265.00 et seq.

---

[1] https://www.youtube.com/watch?v=cl9B37btLkU

7

See County Law § 700(1).  Carville's office has handled multiple criminal possession of a weapon cases.

29. Defendant Ashley Williams is the Livingston County District Attorney and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Onondaga County, including all crimes under N.Y. Penal Law § 265.00 et seq. See County Law § 700(1). As District Attorney, her office has handled gun-related prosecutions.

30. Defendant John Garcia is the Sheriff of Erie County, New York, with county-wide jurisdiction to enforce the laws of the State of New York, including gun laws. Defendant Garcia.

31. The Erie County Sheriff's Office has dedicated personnel who investigate the pistol permit applications for citizens who have applied with the Erie County Clerk's Office for a pistol permit.

32. The Erie County Sheriff's Office completes the investigations for applicants in most of Erie County including Hamburg, New York.

33. Erie County Sheriff's Office Pistol Permit personnel investigate the applicant, and to make a recommendation to the Pistol Permit Licensing Officer at the Erie County Clerk's Office. The licensing officer almost always accepts their recommendation.

34. Defendant Robert Maciol is the Sheriff of Oneida County, New York, with county-wide jurisdiction to enforce the laws of the State of New York,

8

including gun laws. His office regularly makes arrests for illegal gun possession.

35. The Oneida County Sheriff's Office has dedicated personnel that solely investigate the pistol permit applications for citizens who have applied with the Oneida County Permit Office for a pistol permit.

36. The Oneida County Sheriff's Office completes the investigations for applicants in most of Oneida County.

37. Oneida County Sheriff's Office Pistol Permit personnel investigate the applicant, and make a recommendation to the Pistol Permit Licensing Officer at the Oneida County Clerk's Office. On information and belief, the licensing officer almost always accepts their recommendation.

38. Defendant Thomas J. Dougherty is the Sheriff of Livingston County, New York, with county-wide jurisdiction to enforce the laws of the State of New York, including gun laws. Livingston County Sheriff's Office under Sheriff Thomas J. Dougherty has made arrests for illegal gun/firearm possession.

39. The Livingston County Sheriff's Office has dedicated personnel who investigate the pistol permit applications for citizens who have applied with the Livingston County Permit Office for a pistol permit.

40. The Livingston County Sheriff's Office completes the investigations for applicants in most of Livingston County.

41. Livingston County Sheriff's Office Pistol Permit personnel investigate the applicant, and make a recommendation to the Pistol Permit Licensing Officer. On information and belief, the licensing officer almost always accepts their recommendation.

42. On information and belief, None of the seven law enforcement defendants named herein have ever stated they would not vigorously investigate and prosecute any crimes the plaintiffs would be guilty of due to their lack of a permit.

43. All Defendants herein are being sued individually and in their official capacities.

44. All defendants herein at all times acted under color of state law and within the scope of their employment.

45. Each of the seven law enforcement defendants are sued because they need to be enjoined from prosecuting the plaintiffs for exercising their Second Amendment rights as further defined herein.

46. Each of the pistol permit officers is sued for the purpose of seeking an order directing them to issue pistol permits and/or rifle permits to the plaintiffs as further described herein.

## JURISDICTION

47. Jurisdiction is founded on 28 U. S.C. § 1331 because this action arises under the Constitution and laws of the United States, and under 28 U. S.C. § 1343(a)

10

(3) as this action seeks to redress the deprivation, under of color of the laws, statutes, ordinances, regulations, customs and usages of the State of New York, of rights, privileges or immunities secured by the United States Constitution.

48. This action seeks relief pursuant to 28 U. S.C. §§ 2201, 2202, 42 U. S. C. § 1983, 1985.

49. Venue lies in this district pursuant to 28 U. S.C. § 139.

FACTUAL ALLEGATIONS RELATED TO ALL CAUSES OF ACTION

50. The plaintiffs would like to exercise their natural right to keep and bear arms, including handguns and semiautomatic rifles, a right the existence of which is acknowledged by and protected by the Second Amendment to the United States Constitution, and applicable to the States pursuant to the Fourteenth Amendment to the United States Constitution. *District of Columbia v. Heller,* 554 U. S. 570 (2008); *McDonald v. Chicago*, 561 U. S. 742 (2010). *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022); *United States v. Hemani*, 608 U.S. ___ (2026) (Docket No. 24-1234).

51. This right is threatened by New York State laws and their enforcement by the defendants as specified below, necessitating injunctive and declaratory relief pursuant to 42 U.S.C. 1983 to protect their rights.

52. The plaintiffs would like to exercise such right for all the reasons underlying the Second Amendment, including but not limited to self-defense and the

11

defense of their families against criminals and defense and deterrence against the prospect of tyrannical government.

53. Examples of tyrannical governments in history include the Soviet Union, Nazi Germany and Pol Pot's Cambodia.

54. The signposts of incipient tyrannical government in America would include one or more of the following:

- Mass confiscation of firearms;

- Mass arrests without probable cause;

- A crackdown on free speech, press or assembly;

- Martial law (other than during an actual invasion by a foreign army);

- Prohibition of homeschooling or private schools;

- House-to-house searches, permanent roadblocks, checkpoints or internal passports like China, Vietnam and North Korea.

55. While the United States government has not engaged in these practices or the kinds of atrocities associated with the States cited above, it is reasonable to be concerned about the future.

56. One study found the federal government guilty of systematic torture of detainees in the years after 9/11.

57. Historian R. J Rummel, an expert on democide (murder by government), estimates that in the 20th Century, American government killed over 500,000 people, mostly non-combatants killed during bombing raids in foreign wars.

58. The relative rarity of democide against American citizens is consistent with the notion that a well-armed populace deters democide.

59. In Federalist No. 46, James Madison argued that there is no reason to be concerned about the federal government becoming tyrannical in part because of "the advantage of being armed, which the Americans possess over the people of almost every other nation ..."

60. Madison, in effect, argued that the armed populace would defeat the Federal Government's "standing army" in battle!

61. If the drive to deprive Americans of their right to bear arms continues, Americans could soon be as vulnerable to democide as any other people.

THE PURPOSE OF THE RIGHT TO BEAR ARMS

62. The appearance of the signposts of tyrannical government would trigger the right of the people to alter or abolish their government using the tools provided by the right to bear arms, that right being the guarantor of the right of revolution recognized in the Declaration of Independence.

63. The right of revolution, stated by Jefferson and put into practice by Washington, is itself simply the manifestation of the fact that the people, *not the government*, have ultimate and unalienable sovereign power.

64. Thus, the currently fashionable and shallow approach of treating the right to bear arms as merely a nuisance standing in the way of the battle against street crime, is rooted in willful historical ignorance.

65. The Supreme Court has held that the right to bear arms is a "fundamental right. *McDonald v. Chicago*, 561 U. S. 742, 778 (2010).

66. The right to bear arms is entitled to at least the same amount of respect, protection and enforcement that is provided to the other fundamental rights such as free speech, petition, assembly and due process.

67. If there is to be any disparate treatment of the right to bear arms due to its unique nature, it should be given even greater respect, protection and enforcement than the other rights because, logically, historically and empirically, it is the most important right enumerated in the Bill of Rights; it is the right that protects and guarantees all the others.

68. In contrast to the rights to free speech, religion, assembly and petition, being deprived of the right to bear arms can result in immediate death at the hands of a criminal or a tyrannical government (see, e.g., Kent State, Wounded Knee), such death rendering the entire remainder of the Bill of Rights moot and meaningless at that point.

69. Each year in the United States, there are numerous reports of police misconduct and many fatalities associated with those complaints.[2]

70. At the same time when New York State is aggressively attacking the people's right to bear arms, law enforcement is rapidly escalating its own firepower.

71. According to a study by the Cato Institute, "Over the last 25 years, America has seen a disturbing militarization of its civilian law enforcement, along with a dramatic and unsettling rise in the use of paramilitary police units (most commonly called Special Weapons and Tactics, or SWAT) for routine police work. The most common use of SWAT teams today is to serve narcotics warrants, usually with forced, unannounced entry into the home. These increasingly frequent raids, 40,000 per year by one estimate, are needlessly subjecting nonviolent drug offenders, bystanders, and wrongly targeted civilians to the terror of having their homes invaded while they're sleeping, usually by teams of heavily armed paramilitary units dressed not as police officers but as soldiers. These raids bring unnecessary violence and provocation to nonviolent drug offenders, many of whom were guilty of only misdemeanors. The raids terrorize innocents when police mistakenly target the wrong residence. And they have resulted in dozens of needless deaths and injuries, not only of drug offenders, but also of police officers, children,

---

[2] L. Dane, "500 Innocent Americans Killed by Cops Each Year ," *LewRockwell. com* (Dec. 16, 2013).

bystanders, and innocent suspects." Balko, Radley. Overkill: The Rise of Paramilitary Police Raids in America. Washington, DC: Cato Institute, July 17, 2006. https://www.cato.org/white-paper/overkill-rise-paramilitary-police-raids-america.

72. Furthermore, historically, it was the right to bear arms, exercised by the Colonists at Lexington and Concord to defeat a British gun control expedition that ultimately allowed the Colonists to form their own government and enshrine the other rights into the Bill of Rights after the war was won.

NEW YORK GUN LAWS

73. Presently, in the State of New York, the plaintiffs cannot lawfully purchase, possess, carry, keep or bear a "firearm" as that term is defined in New York without the permission of local officials. N. Y. PEN. LAW §§ 265.20(3), 265.01-265.04, 265.20(a)(3), 400.00.

74. These statutes are challenged on their face, as applied herein and based on their widely varying customary applications from county to county.

75. Plaintiffs can only keep and bear a pistol or revolver or handgun or semi-automatic rifle with the prior permission of the state—a license—after meeting, in the subjective opinion of a state licensing officer, a number of different criteria the imposition of which violates the Second Amendment.

76. Such unlicensed possession would constitute a crime under the Penal Law and subject the plaintiffs to the risk of prosecution and imprisonment merely for

16

exercising their natural and constitutional right to bear arms for noble purposes.  See, N. Y. PEN. LAW §§ 265.20(3), 265. 01-265. 04, 265. 20(a)(3), 400.00.

77. Thus, New York State explicitly treats the right to bear arms as a "privilege," not a right, and boasted of this unconstitutional policy in a post-*Bruen* court decision:

> "Under New York law, [i]t is well settled that the possession of a handgun license is a privilege, not a right, which is subject to the broad discretion of a firearms licensing officer." (*Sibley v Watches*, 460 F Supp 3d 302, 319-320 [WD NY 2020].) Also, "[l]icensing officers, often local judges, are 'vested with considerable discretion' in deciding whether to grant a license application, particularly in determining whether proper cause exists for the issuance of a carry license." (*Kachalsky v County of Westchester*, 701 F3d 81, 87 [2d Cir 2012].) As outlined, the licensing officer has discretion in establishing procedures in their county (that comply with what is specifically prescribed by statute). This is evident in the various rules that differ county to county within New York State. *Matter of Cipressi,* 86 Misc 3d 1095 (Sup. Ct. Erie Co. 2025).

78. Applicants must prove they have "good moral character."

79. The state may not condition the exercise of a fundamental right on prior proof of "good moral character."

80. The term "good moral character" is not susceptible of any precise definition or any objective definition whatsoever and is used in New York as a back-door way to keep its "shall issue" regime even after *Bruen*.[3]

81. In our society, there is no general agreement of what "good moral character" means.

82. Some behavior that years ago would have been considered proof of the lack of good moral character is no longer considered to be such.

83. The imposition of such conditions that are impossible to define violates the Second Amendment right to bear arms.

84. In most counties in the state, it can take a year or more to obtain a permit.

85. Recently, the Erie County Permit Office stated in an email to plaintiff Ford Beckwith:

> "Your pistol permit application process has officially begun.
> This process is facilitated by the Erie County Clerk's Office and
> will follow these basic steps:
> Your application gets recorded and is pending an investigation
> by a police agency.
> Your application gets picked up by the police agency for
> investigation.
> Once the investigation is complete, your application will be
> forwarded to the Licensing Officer for review.

---

[3] In the context of a motion for a preliminary injunction, this requirement has been upheld by a panel of the Second Circuit however, plaintiff intends to challenge this holding if and when this case reaches that Court through en banc relief and also by appealing to the Supreme Court if necessary. See, *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)

> After the review process, an approval or denial letter will be
> created and sent to you.
> Please be patient, as this process can take 10-15 months or
> longer due to ongoing changes at the state level. Rest assured,
> we will notify you each time your application moves to the next
> step. There is no need to call our office for updates."

86. A delay of 15 months is the functional equivalent of a revocation or suspension of Second Amendment rights for no just cause.

87. The amount of time applicants are required to wait for approval is unduly burdensome, particularly for people who are elderly, terminally ill or have an urgent need for self-defense because they live in a high-crime area or have been threatened.

88. If the permit is denied, judicial intervention can take an additional year and a half including one appeal as of right to the Appellate Division and cost as much as $5000 for legal fees and costs.

89. The permit process is expensive, thus preventing many low-income people from applying for a permit, constituting a burden not imposed for the exercise of other fundamental constitutional rights.

90. The permit process is time-consuming, constituting a burden not imposed for the exercise of other fundamental constitutional rights.

91. Review by the Appellate Division is deferential and generally a permit denial is reversed only if the Court finds an abuse of discretion.  This necessarily implies that, even after *Bruen,* licensing officers act with *discretion* in

reviewing permit applications. *Dimino v McGinty,* 210 AD3d 1150 (3rd Dept. 2022) ("Respondent's determination was not arbitrary and capricious or an abuse of discretion.").

92. The apparently unrestrained grant of authority to licensing officials to revoke license "at any time" and without notice or a hearing violates the plaintiffs' right to bear arms.  See, Penal Law 400.00(11)(a).

93. The mandatory disclosure of close friends for references, together with the imposition on them of a criminal background check and the imposition upon the applicant of the burden of confessing to one's close friends all of one's sins and shortcomings that a licensing official might conceivably deem significant (see, *Novick v. Hillery*, 183 AD2d 1007 (3rd Dept. 1992)), violates the privacy of all concerned, is unduly burdensome and invites retaliation against political activists and their closest friends.

94. The mandate to provide references in the county where the application is processed violates the Second Amendment rights of those who recently moved into an area.

95. Applicants bear the burden of proof of their entitlement to the "right" to bear arms; receive no hearing before their entitlement to this right is initially determined, and receive post-deprivation judicial review that presumes the licensing officer's decision is correct and applies a deferential standard of

review and imposes the burden of proving error upon the alleged "right"-holder.

96. The permit process involves a massive invasion of privacy, forcing the applicant to identify his or her closest friends who are then subjected to a criminal record check themselves.

97. A right that can only be exercised by seeking prior permission of the government, which permission can be withheld at the government's subjective discretion, is a right that has ceased to exist.

98. All of these elements of the permit regime violate the holding of *Bruen*. Most importantly, there were no "Founding-era laws that 'required advance permission' before a citizen could purchase a firearm." *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023) (panel decision), reh'g en banc granted, vacated, and then addressed en banc; *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc) (Judge Richardson, dissenting) ("there is no evidence that any jurisdiction, before the nineteenth century, required all members of 'the people" to obtain a license . . . before keeping or carrying forearms.")

99. The state may not make "every person seek the government's permission before they can . . . acquire arms." *Id.*

## NEW YORK HAS BEEN AT WAR WITH THE RIGHT
## TO BEAR ARMS SINCE HELLER.

100. It is way past the time to acknowledge and make explicit and specifically remedy what has been obvious for many years: New York, as the birthplace of gun control, and the least free state[4], has had a long-standing and unremitting hostility to the right to bear arms since *Heller's* revolutionary holding that shocked supporters of gun control: the right to bear arms is an individual, natural right, not created by the Constitution at all but merely recognized by it.

101. Even after *Heller* and *McDonald*, the United States Court of Appeals described the latitude provided state judges in denying licenses as being "vested with considerable discretion." *Kachalsky v. County of Westchester,* 701 F3d 81, 87 (2nd Cir. 2012).

102. New York State's official and unofficial policy[5] has been to ignore, thwart, oppose, obstruct and delay the recognition of its own citizens' natural right to bear arms ever since Heller and continuing with the result that New Yorkers' right to bear arms is in worse shape now than when *Heller* was decided.  It is now more expensive and arguably takes more time to get a permit now than before *Heller* while ammunition is now tightly controlled and even some rifles now require a permit.

---

[4] Freedominthe50states.org.

[5] See, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970).

22

103. Ironically, all these years, New Yorkers have been fleeing the state and mostly heading toward states with much freer gun laws such as Florida, Texas and Tennessee. Americans generally have in recent years tended to flee gun control states and to move to freer states.

104. Other than cases that contradicted the direct holding of *Bruen,* plaintiffs are unaware of any New York State appellate court case that granted relief based on the Second Amendment where such relief was opposed by another party to the case. We are aware of many that denied such relief.

105. Governor Hochul essentially declared war on the right to bear arms just a week after *Bruen* was issued, calling *Bruen* "reckless" and signing new legislation to restrict gun rights in an emergency session of the legislature. Concealed Carry Improvement Act, 2022 N.Y. Laws ch. 371. These included new rules on storage and ammunition, replacing "proper cause" with "good moral character" in a game of musical words.

106. These followed previously restrictive laws and were in turn followed by ever more laws and regulations.

107. This war of attrition will never end until New York's licensing powers are stripped away.

## POST-HELLER CASES ON PRIVILEGE

108. Before the *Heller* legal revolution, it was conventional wisdom in New York that a license was a privilege, not a right. See, e.g., *Guddemi v. Rozzi,* 210

23

AD2d 479 (2nd Dept. 1994); *Fondacaro v. Kelly*, 234 A.D.2d 173 (1st Dept. 1996).

109.  The following New York cases continue to consider the right to bear arms a privilege even after *Heller*:  *Papaioannou v. Kelly,* 14 AD3d 459 (1st Dept. 2005) (subject to "broad discretion," licensing officer has "extraordinary power");  *Vasiliou v. Kelly,* 2009 NY Slip Op 31201(U) (Sup. Ct. NY Co. (2009); *Gulotta v. Hart,* 65 Misc. 3d 1233(A) (Sup. Ct. Suffolk Co. 2019); *Gonzalez v. Lawrence,* 36 AD3d 807 (2007) ("broad discretion"); *Velez v. DiBella,* 77 AD3d 670 (2nd Dept. 2010) ("broad discretion"); *Berisha v. Fufidio,* 234 AD3d 685 (2nd Dept. 2025) ("discretion").

110.  New York's war on the Second Amendment will continue until its licensing power, the camel's nose under the tent, is declared unconstitutional under *Bruen*.

## TERRANCE DAUGHTRY

111. Plaintiff TERRANCE DAUGHTRY applied for a pistol and semiautomatic rifle permit in Erie County on or about October 25, 2023.

112. At the time of his application, he was not a user of any controlled substance, however, he had been convicted of criminal possession of a controlled substance in the 7th degree in 2016.

113.  He is not now a user of any controlled substance.

114. His application was denied on November 6, 2023 by Licensing Officer M. William Boller on the grounds that plaintiff's prior conviction for criminal possession of a controlled substance in the 7th degree was a fatal disqualifying factor under Penal Law 400.00(1)(c).

## FORD BECKWITH

115. Ford Beckwith, who is 61 years old, filed an application for a pistol and semiautomatic rifle permit in Erie County on or about May 29, 2026.

116. On June 5, 2026, he was informed by email that the processing of the application would take between 10-15 months.

117. *Bruen* expressly stated that an otherwise lawful permit system may be rendered unconstitutional by undue delay or expense. *Bruen*, 597 U.S. 1, 38–39 & n.9 (2022).

118. The Fourth Circuit pointed out that a delay of only 30 days is inconsistent "with our Nation's historical tradition of firearm regulation." *Maryland Shall Issue, Inc. v. Moore,* 86 F.4th 1038 (4th Cir. 2023) (panel decision), reh'g en banc granted, vacated, and then addressed en banc. Though reversed en banc, the point remains: a delay of 10-15 months is blatantly unconstitutional.

EDWIN J. FERNANDEZ

119.  The plaintiff EDWIN J. FERNANDEZ applied for a pistol permit in Oneida County on or about December 2024.  He holds a pistol permit in Ohio and can lawfully carry a handgun in 32 states.

120.   On April 9, 2025, plaintiff met with court attorney Joshua Bauer to discuss the application.  No testimony was taken.

121.  His application was denied by County Judge and Licensing Officer Nolan on April 10, 2025.  The letter stated:

> "I am writing to advise you that following your hearing with my law clerk, I am denying your application for a pistol permit. This denial is based upon an investigation by the appropriate authorities within Oneida County and upon review of your criminal history.  The above amounts to good cause to deny this application and it, therefore, denied."

122.  Plaintiff then retained attorney James Ostrowski, who made several attempts to convince the Judge to reconsider and to have a hearing.

123. Judge Nolan declined to do so.

124.  James Ostrowski wrote to Judge Nolan on July 3, 2025, stating:

> "Under prevailing constitutional and statutory standards, Mr. Fernandez's prior arrests do not constitute grounds for denial. The leading case on the Second Amendment is *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022). *Bruen* actually strengthened the right to bear arms established by *Heller v. McDonald*. Under *Bruen,* no firearms regulation is valid unless it "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen* at 19. While the burden is on the government to

establish this premise, counsel is unaware of any legal rules in force in 1791 that barred the right to bear arms to those with a series of minor arrests, four of which resulted in dismissals and the other a minor sealed violation conviction. Lest there be any doubt that Penal Law Section 400.00 must be construed with *Bruen's standards in mind,* the United State District Court for the Eastern District of New York, so held in a docket entry: "In its papers, the Suffolk County Attorney fails to argue the proper application of New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 142 S. Ct. 2111 (2022) by dodging the issue, asserting that the subject matter of this case is somehow outside the ambit of the Second Amendment. See Docket Entry 28-35 at 11-13. "This assertion is spurious, seemingly interjected for dilatory purposes. It is obvious that this case involves the proper application of the Second Amendment, and arguments surrounding Bruen are critical to its proper resolution. Indeed, Ms. Zwilling, the Assistant County Attorney handling this case, is well aware of the applicability of the Second Amendment given her work in Torcivia v. Suffolk Cnty., New York. 409 F. Supp. 3d 19, 36 (E.D.N.Y. 2019), affid, 17 F.4th 342 (2d Cir. 2021) ("There can be no question that [Suffolk County's] Revocation and Seizure Policies implicated conduct within the scope of the Second Amendment. At least one of the Policies resulted in the revocation of Plaintiff's pistol license and the temporary seizure of Plaintiff's firearms, and limited Plaintiff's ability to possess handguns."). * * * "Ordered by Judge Gary R. Brown on 7/2/2024. (JP) (Entered: 07/02/2024)" *LaMarco v. County of Suffolk,* CV-22-4629 (EDNY); see also, *Passalacqua v. County of Suffolk,* 2022 U. S. District. LEXIS 223857 (EDNY 2022).

*"*Nothing in Penal Law Section 400.00 bars Mr. Fernandez from obtaining a permit. Notably, he has not been convicted of a "serious offense" as defined in the statute. His last arrest was 17 years ago. Mr. Fernandez has good moral character as he has been for many years a hard-working, law-abiding citizen. See, Letter of Mr. Fernandez, May 6, 2025. In summary, under both constitutional and statutory standards, Mr. Fernandez is eligible for a pistol permit and should receive one."

27

125.  On July 16, 2025, the Court issued an order that stated:

"The applicant in this matter has a history of (4) prior arrests, including arrests for the felonious possession of a controlled substance and the sale of marijuana. Importantly, and to one of the points raised in your correspondence, '(t)he fact that...arrests resulted in the dismissal of the charges against (an applicant)...or were resolved in his favor, (does) not preclude the (licensing officer) from considering the underlying circumstances surrounding those arrests in denying (an) application.' Velez v. DiBella, 77 A. D. 3d 670 (2010); see 1 also Gonzalez v. Lawrence, 36 A.D.3d 807 (2007). In view of the above - in particular, the instant applicant's arrest history and the circumstances surrounding these arrests - it remains this Court's determination that a pistol license will not be issued in this matter owing to the applicant's prior documented involvement with an illicit controlled substance and inasmuch as he lacks the requisite good moral character."

126.  It is telling that both cases cited bestow "broad discretion" on the licensing officer in blatant violation of *Bruen.*

127.  On August 26, 2025, James Ostrowski wrote to Judge Nolan and enclosed an affirmation of plaintiff that denied any use of controlled substances in the previous 16 years.  The affirmation also requested a hearing on the matter.

128. That letter stated:

"I have reviewed your Order of July 16, 2025.  In my view, it raises a new issue that my client has a right to respond to, namely, his use of controlled substances.  Your Order implies that he is currently "an unlawful user of . . . [a] controlled substance."

28

"The petitioner must be given the specific reasons for the denial of the pistol license, and be given an opportunity to respond to the objections to her application. *Savitch v. Lange,* 114 Ad2d 372 (2nd Dept. 1985) (citations omitted).

"I am therefore enclosing herewith his affirmation dated August 19, 2025, in which he denies any current or recent use of controlled substances. In light of that affirmation, I would request that the Court reconsider its decision and schedule an evidentiary hearing in this matter."

129.  On October 24, 2025, Judge Nolan wrote to James Ostrowski and stated:

"This Court is in receipt of and has reviewed your correspondence of August 26, 2025, wherein you request that this Court reconsider its denial of the application for a pistol license submitted by Mr. Edwin Fernandez, which denial was reiterated in a letter to you dated July 16, 2025. Notwithstanding your advocacy on behalf of Mr. Fernandez, this Court's position with regard to his application for a pistol license remains the same and, inasmuch as this Court already held a hearing in this matter on April 9, 2025, no further hearing will be ordered."

130. The charges Judge Nolan based his denial on were as follows:

- PL 240.20—Disorderly Conduct—Violation—Pled Guilty—04/20/2006

- PL 220.16.01 B Felony Criminal Possession of Controlled Substance 3rd—

  Reduced and resolved by ACD—11/28/2007

- PL 220.16.01 B Felony Criminal Possession of Controlled Substance 3rd—

  Reduced and resolved by ACD—11/28/2007

- NYC Health Code 153.09—Forced Conversion—Violation—Dismissed by

  ACD—09/05/2008

29

- PL 221.01 BM Criminal Possession of Marijuana 5th—Dismissed by ACD —02/21/2009

131. Contrary to the letter of October 24, 2025, no actual hearing was held or evidence taken on April 9, 2025. On that date, there was merely a meeting, a chat, between Mr. Fernandez and court attorney Joshua Bauer.

## SAMUEL D'AGOSTINO, JR.

132. Plaintiff Samuel D'Agostino, Jr. held a pistol permit in Livingston County that was issued on or about April, 2024.

133. On August 22, 2025, plaintiff was involved in a one-vehicle motorcycle crash where he went off the road and into a ditch. Three small jars of marijuana were recovered at the scene.

134. The police report states: "R/0 did check Sam for any signs of intox/ impairment and did not observe him to have any HGN, LOC, any odors of alcohol or marijuana, or any green film or plant matter on [his] tongue or mouth. R/0 did advise Sam that [his] bike was brought to his mother's house and his pistols were secured at the Sheriffs Office."

135. There is no evidence that the licensee was under the influence of marijuana at the time of the accident.

136. Largely because of the marijuana issue, defendant Dougherty asked Judge Van Allen to "review Mr. D'Agostino's handgun license privilege."

137.  The Court, ex parte, suspended plaintiff's permit on or about September 10, 2025.

138.  At a subsequent court appearance, Judge Van Allen indicated that, given the language of Penal Law 400.00(1)(e), it may be constrained to revoke Mr. D'Agostino's permit if the Court finds he was in possession of a controlled substance, marijuana, at the time of his motorcycle accident.

139. Plaintiff's counsel responded on February 20, 2026 with a motion to declare that statute, which bars a licensee who is a user of a controlled substance, marijuana, from possessing a firearms license, is unconstitutional as applied to him, and for related relief, including restoration of his firearms permit.

140. The motion was submitted for decision on the papers.

141. On June 18, 2026, the Supreme Court held that casual marijuana use does not disqualify a person from exercising his right to keep and bear arms. *United States v. Hemani*, 608 U.S. ___ (2026) (Docket No. 24-1234).

142. Nevertheless, Judge Van Allen on June 23, 2026, held as follows:

> "The lack of any explanation for why Respondent lost control of the motorcycle, coupled with his history of driving and otherwise behaving recklessly, suggests that he lacks the prudence, carefulness, and judgment necessary to have a pistol permit. Peters 0 Randall, 111 AD3d 1391 (4th Dept 2013). Upon review of the information submitted by the Sheriff, and consideration of the arguments of counsel and the totality of the circumstances, the Court finds that there is good cause to continue the suspension of Respondent's pistol permit. The initial term of the suspension will be one year, beginning on the commencement date of the interim suspension order. Respondent may re-apply in writing to lift the suspension on or after

31

September 10, 2026. As the Court cannot determine on this record that Respondent unlawfully used or is addicted to a controlled substance, his aforementioned motion is denied as moot."

143. Though the investigation was triggered by the discovery of marijuana at the scene, based on the holding of *Hemani,* Judge Van Allen appears to base his decision on the mere fact of a motor vehicle accident.

144. Since as many as two-thirds of drivers are involved in motor vehicle accidents, it is absurd to think that being in an accident can result in suspension of a constitutional right.

145. This case perfectly illustrates the point made above, that New York is not a "shall issue" state, but a "may issue" state where licensing officers are granted an absurd level of discretion and this needs to stop immediately.

146. Because of the administration and enforcement of the above provisions of the pistol permit law and related criminal statutes by the defendants, the plaintiffs have been, and will continue to be, subjected to irreparable harm.

147. At all times herein, the defendants were acting under color of state law.

148. All of the statutes, regulations, court actions, customs and practices referenced herein constitute state action within the meaning of the Constitution.

149. At all times herein, the actions of the defendants have been intentional or in reckless disregard of the clearly established rights of the plaintiffs.

## VI. DAMAGES

150.  On account of the Defendants' actions and violations of their rights as set forth above, the plaintiffs suffered actual damages, including loss of liberty, pain, suffering, humiliation and emotional distress, and were forced to expend funds for permit fees and related expenses.

151.  Plaintiffs are entitled to receive injunctive and declaratory relief, attorney's fees and costs.

FIRST CAUSE OF ACTION—SECOND AND FOURTEENTH AMENDMENTS —NEW YORK'S LICENSING LAW IS UNCONSTITUTIONAL ON ITS FACE

152. Under the *Bruen* historical test, New York's licensing regime is an unconstitutional violation of the Second and Fourteenth Amendments as nothing like it existed in 1791 or even 1868, and the whole notion of licensing was based on a completely new political philosophy unknown to the Founders, progressivism.

153. Language in *Bruen* that seemingly authorizes shall-issue licensing is dicta and/or an unauthorized advisory opinion not binding on any court.  See, *People v. Thompson,* 2025 IL 129965 (Sup. Ct. Illinois 2025)*,* Justice Overstreet, dissenting; *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc) (Judge Richardson, dissenting) ("the constitutionality of shall-issue licensing regimes was not before the Court in *Bruen*")

SECOND CAUSE OF ACTION—SECOND AND FOURTEENTH
AMENDMENTS—NEW YORK'S LICENSING LAW IS
UNCONSTITUTIONAL AS A DE FACTO MAY ISSUE REGIME
PURPORTING TO BE A SHALL ISSUE REGIME.

154.  Even if the Court sustains the permit statute under the First Cause of Action,

plaintiffs contend that the statute improperly operates as a de facto "may issue"

regime in violation of the holding of *Bruen*.

155.  Licensing officers give heavy weight to the recommendation of law

enforcement officials as opposed to objective criteria.

156.  The requirement of "good moral character" is used to allow subjective

discretion to remain a critical factor in violation of the *Bruen*.

157.  The extreme delay and heavy expense involved in the actual operation of

New York's permit regime violates the letter and spirit of *Bruen*.[6]

158.  Both licensing officials and appellate courts in New York continue to state

that the exercise of discretion remains an official policy of the State.

---

[6] "[W]e do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, note 9.

THIRD CAUSE OF ACTION—SECOND AND FOURTEENTH AMENDMENTS—NEW YORK'S BAN ON THOSE CONVICTED OF CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE OBTAINING PERMITS IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED TO THESE FACTS.

159. Plaintiff Terrance Daughtry was denied a permit because of his conviction of the offense of criminal possession of a controlled substance in the 7th degree in 2016.  Penal Law See Penal Law 400.00(1)(c); 265.00(17).

160. These statutes are unconstitutional on their face and as applied to plaintiff.

161. The fundamental right to bear arms may not be infringed because of a seven-year-old misdemeanor conviction unrelated to the current use, possession or misuse of a firearm.  See, *United States v. Hemani*, 608 U.S. ___ (2026) (Docket No. 24-1234); *United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024).

FOURTH CAUSE OF ACTION—SECOND AND FOURTEENTH AMENDMENTS—NEW YORK'S CATEGORICAL BAN ON USERS OF CONTROLLED SUBSTANCES OBTAINING PERMITS IS UNCONSTITUTIONAL AS APPLIED TO THIS CASE

162. Plaintiff EDWIN J. FERNANDEZ was denied a permit because of 18-year old marijuana-relate arrests that resulted in dismissals and one violation plea.

163. The statutes relied upon by the licensing officer are unconstitutional on their face and as applied to plaintiff.

164. Penal Law 400.(1)(e), which purports to bar a citizen from holding a pistol permit for mere possession or use of marijuana, is unconstitutional as applied

35

to the Licensee on these facts.  Penal Law Section 400.00(1)(e), requires that a permit holder not be "an unlawful user of or addicted to any controlled substance as defined in section 21 U.S.C. 802. . ." *In United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024), the Fifth Circuit held that a federal law barring "an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))" from possessing a firearm that was transported in interstate commerce, 18 USC § 922(g)(3)), was unconstitutional as applied to the defendant and upheld dismissal of the charge.  In an extensive analysis, the Court held, applying *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), that history and tradition did not justify applying the statute to the defendant for mere marijuana use.  See also, *United States v. Hemani*, 608 U.S. ___ (2026) (Docket No. 24-1234).

165.   The Court concluded:

> "The analogical reasoning Bruen and Rahimi (2024) prescribed cannot stretch that far. The history and tradition before us support, at most, a ban on carrying firearms while an individual is presently under the influence. By regulating Paola based on habitual or occasional drug use, § 922(g)(3) imposes a far greater burden on her Second Amendment rights than our history and tradition of firearms regulation can support. We AFFIRM the judgment of dismissal as to Paola's as-applied challenge."

166. The holding of *Connelly* is correct and far more strongly grounded than even the Fifth Circuit imagined.

167. The whole notion of applying modern, progressive, drug prohibition legislation to the ancient, libertarian-inspired natural right to bear arms is incongruous and fraught with peril.  The concept of the right to bear arms as a natural right dates back to the Seventeenth century in England and America. See, J. Trenchard, "An argument, shewing that a standing army is inconsistent with a free government and absolutely destructive to the constitution of the English monarchy." (1697). Trenchard wrote that "the Sword and Sovereignty always march Hand in Hand."

168.   Judge Scalia famously argued that the Second Amendment did not create a right to bear arms, but rather, merely recognized a preexisting right, meaning that the right is older than 1791:

> "c. Meaning of the Operative Clause. Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed." As we said in United States v. Cruikshank, 92 U. S. 542, 553 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second amendment declares that it shall not be infringed … ." *District of Columbia v. Heller*, 554 U.S. 570 (2008)

169.   The federal war on drugs originated 123 years later with the passage of the Harrison Narcotics Tax Act in 1914.  The statutes at issue in this action are a derivative of that original law and inspired by the novel concept of progressivism that underlies the policy of drug prohibition.  Progressivism basically amounts to the notion that positive government intervention can and should solve any and all human problems that come along.  Thus, the Founders operated in a *libertarian* era that focused on limited government protecting natural rights, while drug prohibition is the product of a radical shift in ideology to *progressivism*, which swept the country no sooner than the Presidency of Theodore Roosevelt in 1901, but only kicking into high gear around 1913-14 (the Wilson Administration) with the passage of the Income Tax, the Federal Reserve and the Harrison Act.

170. While the country's *ideology* changed and *legislation* changed, the Second Amendment was never repealed or amended. This raises the thorny question of how progressive statutes can be used to override libertarian natural rights when those kinds of laws were unheard of in 1791 and would likely have appalled the Framers? That is a question that proponents of these statutes, not their opponents, must address as *Bruen* places the burden of proving such laws are consistent with the history and traditions of the Second Amendment squarely on the government:

"Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

"Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."

"We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement." *New York State Rifle & Pistol Association, Inc. v. Bruen* (597 U.S. 1, 2022).

171.  A complete ban on marijuana users and former drug users bearing arms would violate the purpose of the Second Amendment.

172.  A primary purpose of the right to bear arms is to deter government tyranny.[7] Contrary to gun control propaganda, it has been remarkably successful in that regard as the United States has largely avoided many government atrocities that have plagued other countries throughout history, in very recent history, and currently.  Retroactively and judicially amending the Second Amendment to carve out a marijuana or drug use exception to that natural right would suddenly disenfranchise over well over 60 million citizens from their right to be ready and able to defend the republic whenever necessary, for example, at Lexington Green on April 19, 1775.  See, *Hemani*, slip opinion at 17; Judge

---

[7] See, *Heller* at 599-600; *McDonald* at 857, *Rahimi* at 690; Robert E. Shalhope, "The Armed Citizen in the Early Republic" *Law and Contemporary Problems* 49, no. 1 (Winter 1986): 125, 130–131.

Alito concurring at 2: "Marijuana consumption is increasingly common in this country."

173.   Worse yet, by the very same logic, with a stroke of a pen, Congress or the New York State Legislature could ban gun owners from using other mind-altering chemicals such as alcohol (135 million users) and tobacco (50 million users), and thereby render the citizens of America as defenseless against tyranny as North Koreans and Iranians.

174.   Applying modern progressive ideology retroactively to limit the right to bear arms cannot be tolerated lest the right eventually disappear completely with dire consequences.

175.   The Court should declare that Penal Law 400.00(1)(e) is unconstitutional on its face and as applied to the licensee, the licensee's application for a pistol permit should be granted, and the Court should grant such further relief as the Court deems just and proper. *United States v. Hemani*, 608 U.S. ___ (2026) (Docket No. 24-1234).

FIFTH CAUSE OF ACTION—SECOND AND FOURTEENTH AMENDMENTS
AN ADMITTED DELAY OF 10-15 MONTHS IN PROCESSING A PERMIT
APPLICATION IS A VIOLATION OF THE RIGHT TO BEAR ARMS.

176.  Plaintiff Ford Beckwith has been officially informed that his permit application will not be acted upon for 10-15 months.

177. This lengthy delay is an unconstitutional violation of the right to bear arms.

SIXTH CAUSE OF ACTION—SECOND AND FOURTEENTH AMENDMENTS
—NEW YORK'S REQUIREMENT OF A LICENSE TO POSSESS A
SEMIAUTOMATIC RIFLE IS A VIOLATION OF THE RIGHT TO BEAR
ARMS.

178.  Plaintiffs Ford Beckwith and Terrance Daughtry have standing to challenge New York's license requirement to possess a semiautomatic rifle; Beckwith due to unreasonable delay in processing his application and Daughtry, due to his explicit denial.

179.  This requirement was imposed in 2022 as part of New York's ongoing war on the Second Amendment.

180. A ban on long guns is unconstitutional under *Bruen* as having no historical analog in 1791.

181. Furthermore, the core of the right to bear arms, insofar as it deters government tyranny, is based on the right of citizens to keep and bear long guns so that they are not massacred by a tyrannical government as has happened too many times in other countries.

182. For obvious reasons, handguns have repeatedly failed to be effective in resisting government tyranny, for example, during the Warsaw Ghetto Uprising of 1943.  In sharp contrast, long guns have proven to be effective against genocidal regimes, for example, during the Armenian Genocide (1915–1923)

183.  New York's statute requiring a permit for a semiautomatic rifle is unconstitutional on its face and as applied herein.

41

SEVENTH CAUSE OF ACTION—SECOND AND FOURTEENTH AMENDMENTS—PLAINTIFF D'AGOSTINO'S RIGHT TO BEAR ARMS WAS VIOLATED BY SUSPENSION OF HIS PERMIT ON GROUNDS NOT AUTHORIZED BY BRUEN.

184. As explained above, Judge Van Allen initially suspended plaintiff D'Agostino's license due to suspicion of marijuana use.

185. After the Supreme Court ruled out such a basis for suspension, Judge Van Allen suspended due to plaintiff's involvement in a one-vehicle accident.

186. Such grounds are clearly a violation of the right to bear arms given the absence of any historical analog to penalizing citizens who have been involved in vehicular or horse-riding accidents.

WHEREFORE, the plaintiffs respectfully request that the Court:

1. Assume jurisdiction of this action;

2. Enter judgment against the Defendants and in favor of the plaintiffs;

3. Enter a declaratory judgment that the provisions of the Penal Law specified herein infringe on the right of the people to keep and bear arms and right to due process, in violation of the Second and Fourteenth Amendments to the United States Constitution and are void.

4. Issue preliminary and permanent injunctions enjoining the defendants and their officers, agents, and employees from the administration and enforcement of the provisions alleged herein to violate the United States Constitution.

5. Order the licensing officers herein to issue permits to plaintiffs Daughtry, Beckwith, Fernandez and D'Agostino pursuant to the second through seventh causes of action.

6. Award Plaintiffs all costs and disbursements incurred in the prosecution of this action, including reasonable attorneys' fees under 42 U. S. C. § 1988; and

7. Grant such other and further relief as may be proper.

Dated:     Buffalo, New York
           July 4, 2026

_____
JAMES OSTROWSKI
Attorney for Plaintiffs
448 Delaware Ave.
Buffalo, New York 14202
(716) 435-8918
jamesmostrowski@icloud.com